389 A.2d 1229.

STATE OF RHODE ISLAND $v$. CHARLES DeROCHE.

JULY 20, 1978.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

WEISBERGER, J. This case comes before the court on the defendant's appeal from an imposition of sentences. The sentences were imposed as a result of determinations that the defendant had violated his probationary status in respect to three indictments.

In 1974 defendant pleaded nolo contendere to two indictments charging him with entering a dwelling with intent to commit larceny (Indictment Nos. 73-1268 and 74-573) and one indictment charging him with being an accessory after the fact of entering a dwelling with intent to commit larceny (Indictment No. 74-769). In respect to Indictment No. 73-1268, defendant received a 2-year suspended sentence and was placed on probation for 5 years. In respect to Indictment No. 74-573, he was placed on probation for 3 years. In respect to Indictment No. 74-769, he was also placed on probation for 3 years.

In 1976 the state charged that defendant had violated the terms of his probationary status on these three indictments in that he allegedly robbed one Thomas Marcaccio on January 30, 1976. After hearings held on February 18 and February 27, 1976, defendant was found to be a violator of his probationary status in respect to all three indictments and was thereafter sentenced to serve 5 years on Indictment No. 74-573 and also to serve 5 years concurrently on Indictment No. 74-769. He was continued on his suspended sentence in respect to Indictment No. 73-1268.

The defendant has appealed from the judgments of conviction on the ground that the revocation of his probation in each case was based primarily upon a hearsay statement taken by a state police detective sergeant from an alleged accomplice, one John Cariglio. In this statement Cariglio admitted his part in the robbery and identified defendant as the person with whom he divided the proceeds thereof after the crime had been committed. The victim, Mr. Marcaccio, an 84-year-old man, testified that he was robbed by two individuals, one of who he identified as a person named "John."

However, he was unable positively to identify defendant, although he stated that the second robber looked "something like" defendant. Mr. Marcaccio stated that the robbers had switched off the lights and that therefore he had difficulty in obtaining a clear look at the second robber. The victim's description of "John" led the police to John Cariglio.

Sergeant Charles Cunningham testified at the hearing that he took an oral statement from Cariglio in which the latter admitted his part in the robbery and named another participant whom he knew only as "Chick." As a result of Cariglio's description of Chick's automobile and his furnishing the name of a girl with whom Chick shared an apartment, the officer was led to Chick's apartment where he arrested defendant. Later he arranged for a confrontation between defendant and Cariglio, during which confrontation Cariglio identified defendant as his accomplice. This confrontation took place at the state police barracks in Lincoln where a written statement was taken from Mr. Cariglio. This statement was signed by Cariglio and sworn to before a notary public. The typewritten statement was introduced into evidence and constituted the major portion of the evidence relied upon by the trial justice in finding defendant to be a violator. There seems to be no question that in the absence of Cariglio's oral and written statements given to Sergeant Cunningham, there would have been an insufficient evidentiary basis to connect defendant with this crime under the burden of proof applied to violation hearings. *State* v. *Bettencourt*, 112 R.I. 706, 315 A.2d 53 (1974).

This court has frequently stated that strict rules of evidence need not be followed in violation hearings. *State* v. *Welch*, 114 R.I. 187, 330 A.2d 400 (1975); *State* v. *Skirvin*, 113 R.I. 443, 322 A.2d 297 (1974); *State* v. *Bettencourt, supra; Flint* v. *Howard*, 110 R.I. 223, 291 A.2d 625 (1972). In *Tillinghast* v. *Howard*, 109 R.I. 497, 287 A.2d 749 (1972), this court sustained the admission of a prior inconsistent statement from a state's witness who purported to have lied

to the police when he complained to them that Tillinghast had robbed him. The court accepted this prior statement given to the police as sufficient proof to find Tillinghast guilty of the violation of his probation, although the only other evidence consisted of the victim's disavowal of his prior statement. In so holding, we followed *Charest* v. *Howard*, 109 R.I. 360, 285 A.2d 381 (1972); *Harris* v. *Langlois*, 98 R.I. 387, 202 A.2d 288, *cert. denied*, 379 U.S. 866, 85 S. Ct. 138, 13 L.Ed. 2d 70 (1964); and *Almeida* v. *Langlois*, 97 R.I. 325, 197 A.2d 498 (1964). All of these cases were based upon the general theory that probation was a matter of grace and that revocation hearings were in effect privileges conferred by statute as opposed to rights guaranteed under the Constitution. These cases followed the rationale set forth in *Escoe* v. *Zerbst*, 295 U.S. 490, 492-93, 55 S. Ct. 818, 819-20, 79 L.Ed. 1566, 1568-69 (1935), wherein Mr. Justice Cardozo stated:

> "Probation or suspension of sentence comes as an act of grace to one convicted of a crime, and may be coupled with such conditions in respect of its duration as Congress may impose.
>
> * * *
>
> "Clearly the end and aim of an appearance before the court must be to enable an accused probationer to explain away the accusation. The charge against him may have been inspired by rumor or mistake or even downright malice. He shall have a chance to say his say before the word of his pursuers is received to his undoing. This does not mean that he may insist upon a trial in any strict or formal sense."

The rationale of *Escoe* v. *Zerbst, supra,* was rejected in *Morrissey* v. *Brewer*, 408 U.S. 471, 481-82, 92 S. Ct. 2593, 2600-01 33 L.Ed.2d 484, 494-95 (1972), in the following terms:

> " '[T]his Court now has rejected the concept that constitutional rights turn upon whether a governmental

benefit is characterized as a "right" or as a "privilege." '
*Graham* v. *Richardson,* 403 U.S. 365, 374 (1971).

* * *

"We see, therefore, that the liberty of a parolee,
although indeterminate, includes many of the core
values of unqualified liberty and its termination inflicts
a 'grievous loss' on the parolee and often on others. It is
hardly useful any longer to try to deal with this problem
in terms of whether the parolee's liberty is a 'right' or a
'privilege.' "

We recognized this essential change in constitutional doctrine
in *State* v. *Salvail,* 117 R.I. 1, 362 A.2d 135 (1976), and
indicated that it might foreshadow changes in revocation
proceedings.

*Morrissey* dealt with a parole revocation hearing and
mandated certain minimum due process requirements. The
Supreme Court of the United States having found that the
liberty of a parolee was within the protection of the due pro-
cess clause of the fourteenth amendment, then proceeded to
determine what process was due. The Court required two
hearings: first, a preliminary hearing to take place shortly
after the time of arrest, and then a second or revocation hear-
ing.[1] The minimum requirements for the revocation hearing
were said to include the following:

"(a) written notice of the claimed violations of parole;
(b) disclosure to the parolee of evidence against him;
(c) opportunity to be heard in person and to present
witnesses and documentary evidence; (d) *the right to
confront and cross-examine adverse witnesses (unless
the hearing officer specifically finds good cause for not*

---

[1]In *State* v. *DeLomba,* 117 R.I. 673, 370 A.2d 1273 (1977), we specifically held
that for probation violations two hearings were not constitutionally mandated, but
that due process is satisfied by the kind of unitary hearing which Rhode Island
procedure affords.

*allowing confrontation);* (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole. We emphasize there is no thought to equate this second stage of parole revocation to a criminal prosecution in any sense. It is a narrow inquiry; the process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial."

"We do not reach or decide the question whether the parolee is entitled to the assistance of retained counsel or to appointed counsel if he is indigent." *Morrissey* v. *Brewer, supra* at 489, 92 S. Ct. at 2604, 33 L.Ed. 2d at 499 (emphasis added).

The minimum due process requirements for a parole hearing were applied a year later to probation revocation hearings in *Gagnon* v. *Scarpelli,* 411 U.S. 778, 93 S. Ct. 1756, 36 L.Ed. 2d 656 (1973). In footnote 5, Mr. Justice Powell noted:

"While in some cases there is simply no adequate alternative to live testimony, we emphasize that we did not in *Morrissey* intend to prohibit use where appropriate of the convential substitutes for live testimony, including affidavits, depositions, and documentary evidence." *Id.* at 783, 93 S. Ct. at 1760, 36 L.Ed. 2d at 662.

Thus, in both *Morrissey* and *Gagnon,* the Court indicated that the evidentiary strictures which apply to a full-scale criminal trial are not constitutionally mandated for revocation proceedings. The Court, however, did not go so far as to define the evidentiary limits which do apply, but some guidance may be gained by examining certain cases decided by the Supreme Court in recent years in respect to use of hearsay testimony at trial in the light of the sixth amendment right to confrontation.

*In California* v. *Green,* 399 U.S. 149, 90 S. Ct. 1930, 26 L.Ed.2d 489 (1970), the Supreme Court of the United States overruled the Supreme Court of California when the latter held that a prior inconsistent statement could not be used for the truth of the matter asserted, even though, as the Court noted, citing 3 Wigmore, *Evidence* §1018 (3d ed. 1940), the orthodox rule followed by a majority of jurisdictions considered such statements as hearsay to be used only for the limited purpose of impeachment. The Court pointed out a distinction between hearsay rules and the right to confrontation:

> "While it may readily be conceded that hearsay rules and the Confrontation Clause are generally designed to protect similar values, it is quite a different thing to suggest that the overlap is complete and that the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions as they existed historically at common law. Our decisions have never established such a congruence; indeed, we have more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception. See *Barber* v. *Page,* 390 U.S. 719 (1968); *Pointer* v. *Texas,* 380 U.S. 400 (1965). The converse is equally true: merely because evidence is admitted in violation of a long-established hearsay rule does not lead to the automatic conclusion that confrontation rights have been denied." 399 U.S. at 155-56, 90 S. Ct. at 1933-34, 26 L.Ed. 2d at 495-96.[2]

---

[2]In adopting this rationale of distinguishing between the right of confrontation and cross-examination, the Court departed from Wigmore's theory that there was no real distinction at common law between the right to confrontation and the right of cross-examination. In his view the purpose of confrontation was to secure the right to cross-examine. 5 Wigmore, *Evidence* §1397 (Chadbourn rev. 1974). Wigmore recognized the secondary advantage to be obtained by the personal appearance of the witness so that his deportment could be observed by the triers of fact as an additional value of confrontation. *Id.* §1395. Wigmore traces the emergence of the hearsay rule to the Restoration period and early 1700's after a period of a century and a half when felony and treason trials were conducted with liberal use of depositions and extra-judicial statements under oath in place of personal production of witnesses. *Id.* §1364.

The Supreme Court in *Green* went on to determine that the use of the prior inconsistent statement for the proof of the matter asserted, even though it constituted a variation of the traditional hearsay exception rule, was not a violation of the sixth amendment right to confrontation. The Court placed some emphasis on the fact that the witness was present and available for cross-examination at the trial itself. It did throw out a caveat concerning the possible effect of the witness' lapse of memory in that it might be so complete as to make cross-examination substantially impossible. This might have made the case more analogous to *Douglas* v. *Alabama*, 380 U.S. 415, 85 S. Ct. 1974, 13 L.Ed. 2d 934 (1965), where an alleged confession of an accomplice was read into the record at trial, although the accomplice, who was present, refused to testify concerning the confession on self-incrimination grounds. Thus, it seems reasonably clear that if a witness is present at trial and available for cross-examination, the use of a prior statement would not violate the values protected by the confrontation clause.

It should be noted that the principles enunciated in *California* v. *Green, supra,* related to the use of hearsay evidence at a trial as opposed to a *Morrissey*-type probation-revocation hearing.

The Supreme Court has been gradually developing a certain deference for the reliability of extra-judicial statements made against penal interests. Traditionally declarations against pecuniary or proprietary interests were admissible as exceptions to the hearsay rule. McCormick, *Evidence* §277 (2d ed. 1972); 5 Wigmore, *Evidence* §§1458-60 (Chadbourn rev. 1974). However, the House of Lords in 1844 determined that a declaration indicating criminal liability on the part of the declarant was not admissible as a declaraion against interest. *Sussex Peerage Case*, 11 Cl. & F. 85, 8 Eng. Rep. 1034 (1844). This case was widely followed by American courts, although criticized by scholars and text writers. 5 Wigmore, *supra* §1477. The Supreme

Court of the United States also determined that a statement against penal interest in the form of a confession by a third person that he committed the murder for which defendant was accused was inadmissible in spite of a strong dissent by Mr. Justice Holmes. *Donnelly* v. *United States*, 228 U.S. 243, 33 S. Ct. 449, 57 L.Ed. 820 (1913). Although this case has never been overruled, it has been eroded by the case of *Chambers* v. *Mississippi*, 410 U.S. 284, 93 S. Ct. 1038, 35 L.Ed. 2d 297 (1973), in which the Court held that the petitioner had been denied due process when he was not allowed to present the evidence of three witnesses to whom the confessions of an alternate alleged perpetrator of the same crime had been repeated. The Court indicated that the particular statements under consideration bore substantial assurances of trustworthiness. The Court also noted in *Dutton* v. *Evans*, 400 U.S. 74, 91 S. Ct. 210, 27 L.Ed. 2d 213 (1970), that a statement implicating the defendant made to a fellow prisoner could be admitted without violating the confrontation clause under a Georgia rule which admitted statements of a coconspirator made during the concealment phase of the conspiracy, and which differed from the rule applied in federal courts concerning statements of a coconspirator.[3] Among the indicia of reliability was the fact that this statement was against the penal interest of the declarant.

In cases relating to the determination of probable cause, the Supreme Court has emphasized the reliability of statements made against penal interest. *United States* v. *Harris*, 403 U.S. 573, 91 S. Ct. 2075, 29 L.Ed. 2d 723 (1971). It is also of interest to note that under the present rules of evidence applicable in federal courts, Rule 804(b)(3) of the

---

[3]In federal conspiracy trials the hearsay exception for statements of coconspirators applied only if the statement was made in the course of and in furtherance of the conspiracy, not during a subsequent period when the conspirators were engaged only in concealment of the enterprise. *Dutton* v. *Evans*, 400 U.S. 74, 81, 91 S. Ct. 210, 215-16, 27 L. Ed. 2d 213, 222 (1970); *Lutwak* v. *United States*, 344 U.S. 604, 73 S. Ct. 481, 97 L.Ed. 593 (1953); *Krulewitch* v. *United States*, 336 U.S. 440, 69 S. Ct. 716, 93 L.Ed. 790 (1949).

Federal Rules of Evidence would admit a statement that "so far tended to subject [the declarant] to civil or criminal liability * * * that a reasonable man in his position would not have made the statement unless he believed it to be true."

In its enforcement of the confrontation clause, the Supreme Court of the United States has not manifested an intention to freeze at a given point in time the development of exceptions to the exclusionary hearsay rules where indicia of reliability would justify such exceptions, even though they constitute a departure from traditional evidentiary rules.

It is noteworthy that in *Morrissey* v. *Brewer* and *Gagnon* v. *Scarpelli*, both *supra*, the Court specifically stated that the tribunal might under certain circumstances deny confrontation and the right to cross-examine.

In a concurring opinion in *California* v. *Green, supra*, Mr. Justice Harlan stated:

> "What I would hold binding on the States as a matter of due process is what I also deem the correct meaning of the Sixth Amendment's Confrontation Clause — that a State may not in a criminal case use hearsay when the declarant is available." 399 U.S. at 186, 90 S. Ct. at 1949, 26 L.Ed. 2d at 513.

In the case at bar it is important to note that we are dealing with a violation hearing in which the evidentiary standards are not as rigid as those which are applicable in a criminal trial. Nevertheless, we are bound by the minimum requirements set forth in *Morrissey* v. *Brewer, supra*. One of those requirements is "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)." As suggested by Mr. Justice Harlan, a critical issue in determining the right to confrontation is always the availability of the witness. In respect to availability, a threshold determination must be made by the tribunal. If the witness is unavailable, then the tribunal may consider other elements

such as reliability and evidentiary exceptions to the hearsay rule. *See Barber* v. *Page,* 390 U.S. 719, 88 S. Ct. 1318, 20 L.Ed. 2d 255 (1968). It may also consider the effect of a statement against penal interest in determining reliability.

An examination of the record in the case at bar does not indicate that the trial justice specifically found good cause for not allowing confrontation. Such good cause may have existed, but the record is barren of either evidence or determination on that issue. In accepting the hearsay evidence the trial justice was understandably relying upon our prior cases.

Nevertheless, the Rhode Island cases which have been decided on the use of hearsay in a violation hearing are subject to the minimum requirements laid down in *Morrissey* v. *Brewer, supra.* Before admitting hearsay, particularly on issues which are central to the determination of the commission of the violation, the trial justice must determine whether there is good cause for denying confrontation and/or cross-examination. Since this essential condition precedent was not satisfied in this case, the receipt of the hearsay evidence in these circumstances was consitutionally impermissible. *Commonwealth* v. *Davis,* 234 Pa. Super. 31, 336 A.2d 616 (1975).

The defendant's appeal is sustained, the judgments of conviction are hereby vacated, and the indictments are remanded to the Superior Court for further proceedings in accordance with this opinion.

*Julius C. Michaelson,* Attorney General, *E. Martin Stutchfield,* Special Assistant Attorney General, for plaintiff.

*Barbara Hurst* and *John A. MacFadyen, III,* Assistant Public Defenders Appellate Division, for defendant.